UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JACQUELINE GAINES and OLYMPIA MORRIS[1]<br><br>Plaintiffs,<br><br>v.<br><br>SACRAMENTO COUNTY CHILD PROTECTIVE SERVICES AGENCY, an agency of the County of Sacramento; ANN EDWARDS, in her individual and professional capacities; SANDRA THOMPSON, in her individual and professional capacities; SHAUNTE DERRICK, in her individual and professional capacities; and SANTRICE DAVIS, in her individual and professional capacities,<br><br>Defendants. | No. 2:12-cv-01450-GEB-EFB<br><br>**ORDER GRANTING EACH DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Each Defendant moves for summary judgment on each claim alleged against the movant.[2] Plaintiffs allege in their Complaint the following claims under California law: negligence, intentional infliction of emotional distress, and conspiracy.

---

[1] The caption has been modified because Olympia Morris, referred to as "O.M." when this suit was filed, turned 18 on March 20, 2012. Therefore, the use of her initials is no longer required under Federal Rule of Civil Procedure ("Rule") 5.2. (See Compl. ¶ 4.)

[2] Defendant Santrice Davis filed a separate summary judgment motion. (See Mem. P.&A. Supp. Mot. Summ. J. ("Davis Mot."), ECF No. 30.) Since both motions raise similar arguments, they are considered together.

1

(Compl. ¶¶ 17, 28-37.) Plaintiffs allege the following claims under 42 U.S.C. § 1983: due process, equal protection, familial association, and conspiracy. (Id. ¶ 22.) The factual allegations underlying the claims are the following: Defendants wrongfully removed Plaintiff Olympia Morris ("Morris") from the custody of her mother, Plaintiff Jacqueline Gaines ("Gaines"), falsified investigative reports, gave false testimony during Juvenile Court dependency proceedings, made unfounded recommendations to the Juvenile Court on visits Gaines and Morris should have with each other, and failed to ensure Morris' well-being while she was in foster care. (See id. ¶¶ 4, 6-13.)

Plaintiffs' attorneys filed a Notice of Non-Opposition to the pending motions on March 24, 2015. (ECF No. 38.) However, on April 17, 2015, Gaines filed an unverified response to the motions in propia persona. (ECF No. 43.)[3]

## I.  LEGAL STANDARD

> A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." . . . The moving party has the burden of establishing the absence of a genuine dispute of material fact.

City of Pomona v. SQM North Am. Corp., 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). "A fact is 'material' when . . . it could affect the outcome of the case." Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S.

---

[3] Plaintiffs' counsel filed a Motion to be Relieved as Counsel on March 26, 2015, which was denied on May 6, 2015.

2

242, 248 (1986)). "A[] [dispute] of material fact is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or . . . showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B).

Local Rule 260(b) prescribes:

> Any party opposing a motion for summary judgment . . . [must] reproduce the itemized facts in the [moving party's] Statement of Undisputed Facts and admit those facts that are undisputed and deny those that are disputed, including with each denial a citation to the particular portions of any pleading, affidavit, deposition, interrogatory answer, admission, or other document relied upon in support of that denial.

If the nonmovant does not "specifically . . . [controvert duly supported] facts identified in the [movant's] statement of undisputed facts," the nonmovant "is deemed to have admitted the validity of the facts contained in the [movant's] statement." Beard v. Banks, 548 U.S. 521, 527 (2006).

Because a district court has no independent duty "to scour the record in search of a genuine issue of triable fact," and may "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment," . . . the district court . . . [is] under no obligation to undertake a cumbersome review of the record on the [nonmoving party's] behalf. Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011,

3

1017 (9th Cir. 2010) (quoting Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir. 1996)).

## II. UNCONTROVERTED FACTS

Each motion is supported with the following uncontroverted facts.

"On November 18, 2008, while at school, [Morris] entered [Vice Principal and Counselor Michele Gorman's] office, and told Gorman that she was afraid to go home out of concern over a bad progress report. [Morris] also informed Ms. Gorman that her mother had hit her before." (Statement of Undisputed Material Facts Supp. Defs.' Mot. Summ. J ("SUF") No. 2, ECF No. 29-3.) Specifically, Morris "told . . . Gorman that her mother . . . [had previously] hit her across the face . . . because of her cellphone bill." (Id. No. 3.) Gorman, a "mandated child abuse reporter . . . . completed a suspected child abuse report" on November 18, 2008, which detailed Morris' account of alleged abuse, stating: "[Morris] is fearful that her mom will hit her again." (Id. Nos. 4-6.) Gorman also "telephoned [CPS]" and "spoke with Leslie Green at CPS and told her exactly what she had written on the child abuse report." (Id. Nos. 7-8.) "Ms. Green indicated that they would not be able to get a CPS worker out to the school that afternoon, and suggested that Gorman call law enforcement." (Id. No. 9.) That same day, Gorman "called the Sacramento City Police and made the same report of suspected child abuse." (Id. No. 10.) "[F]ollowing . . . Gorman's call . . . two police officers responded to [Morris'] school" and "escorted [her] to her home," where they "spoke to both Gaines and [Morris.]" (Id. Nos. 11-13.) The officers left, and Morris

"slept at home that night." (Id. No. 15.)

On December 9, 2008, Defendant Sandra Thompson conducted a home visit with Morris and Gaines regarding the November 18, 2008 child abuse allegations, and "reported her interaction with the family to a CPS supervisor" on December 10, 2008. (Id. Nos. 16-17; Dep. Sandra Thompson 19:20-20:4, Ex. C to Decl. Mark P. O'Dea ("O'Dea Decl."), ECF No. 29-5.) Thompson stated in that report:

> [Morris] disclosed that she was afraid and that her mom hit her in the eye a few weeks before. She disclosed that she had blurred vision and was still experiencing some pain. She was crying. Her mother was pointing her finger in her face. [I] could not calm Ms. Gaines down, nor was [I] able to establish a safety plan with Ms. Gaines.

(SUF No. 18.)

"On December 11, 2008 . . . Thompson interviewed [Morris] at her school. [Morris] indicated that she was fearful of returning home and she reported that her mother had been verbally and physically abusive toward her and she was afraid of going to sleep at night." (Id. No. 20.) "Thompson made a decision not to detain [Morris at that time] because she did not have enough information . . . and did not believe that exigent circumstances existed. She also did not believe that [Morris] was in imminent danger while she was at school." (Id. No. 21.) That same day, "[Morris] reported to the school principal and vice principal/counselor that she did not want to go home," and "school staff [then] called the Sacramento Police Department for assistance, and Officer Christopher Shippen responded." (Id. Nos. 22-23.) Subsequently, Officer Shippen spoke to Morris at school,

after which he transported her home, where he "made contact with . . . Gaines." (Id. Nos. 25-26.) Shippen spoke with with Morris and Gaines, and "at one point during the conversation the interaction between [Plaintiffs] became very, very heated, with both participants raising their voice and yelling at each other." (Id. No. 27.) As a result, Officer Shippen "became concerned" and "decided to intervene and formulate a plan to take [Morris] into protective custody and transport her to the children's receiving home to ensure that both parties were separated and that the situation would not deteriorate any further." (Id. No. 28.)

"[N]o one from CPS was present at the family residence during the time that Officer Shippen interacted with Gaines and [Morris] and [when he] made the decision to take [Morris] into protective custody." (Id. No. 29.) Further, "[o]n December 11, 2008, Officer Shippen did not contact CPS . . . in connection with his decision to take [Morris] into protective custody." (Id. No. 30.)

"On December 16, 2008, the . . . Juvenile Court conducted a . . . hearing" at which Gaines was represented by counsel. (Id. No. 34.) "At the hearing, the [Juvenile Court] found that . . . [living] . . . in [Gaines'] home was contrary to [Morris'] welfare . . . [and ordered that Morris] be detained by the Department of Health and Human Services." (Id. No. 35.) The Juvenile Court also scheduled a status hearing on January 8, 2009, which was continued to January 29, 2009. (Id. Nos. 36-37.)

In connection with the Juvenile Court proceedings, Defendant Shaunte Derrick interviewed Gaines on January 21, 2009, and Morris on January 22, 2009. (Id. Nos. 38-39.) Derrick

subsequently "prepared a summary of the interview[s] and entered [them] into the CPS [c]omputer system." (Id. No. 38.)

> On or about January 27, 2009 [Derrick] prepared [a report] for the [January 29, 2009] hearing . . . . In preparing the [report], [Derrick] included, verbatim, her summaries of her interviews with [Gaines and Morris]. In particular, [Derrick] included all of [Gaines'] statements denying and disputing the allegations of abuse made by [Morris].

(Id. No. 40.)

The January 29, 2009 status hearing was continued to April 30, 2009, at which time the Juvenile Court also scheduled a jurisdiction/disposition hearing. (Id. Nos. 41-44.) The Juvenile Court held jurisdiction/disposition hearings on multiple dates in June and July 2009, including on June 10, 2009 and June 11, 2009, at which time Defendant Thompson testified. (SUF Nos. 47-48.) On July 21, 2009, the Juvenile Court issued an order that Morris "should be adjudged a dependent child of the court." (Id. No. 87.) The order specified that Gaines "shall have regular visitation with [Morris] consistent with [Morris'] wellbeing[,]" and that "[t]he Department of Health and Human Services shall determine the time, place and manner of visitation, including the frequency of visits, length of visits and whether the visits are supervised and who supervises them." (Statement of Undisputed Material Facts Supp. Davis Mot. Summ. J. ("Davis SUF") No. 3, ECF No. 32.)

"Defendant Davis was assigned as Plaintiffs' family reunification social worker" in June 2009, while Gaines' custody of Morris was being contested in Juvenile Court. (Id. No. 2.) "At the time . . . Davis was assigned to the case[,] visitation

Case 2:12-cv-01450-GEB-EFB   Document 47   Filed 05/08/15   Page 8 of 11

1  [between Gaines and Morris] was supervised . . . . [Davis] . . .
2  met with [Plaintiffs] about once a month." (Id. No. 4.)

> The supervised visits [between Plaintiffs] changed to unsupervised in April of 2010 after a meeting . . . between Defendant Davis, Plaintiffs and [Morris'] siblings and her grandmother. They all met and had dinner . . . during which time Defendant Davis witnessed an interaction between the Plaintiffs that she had never seen throughout the case. Her understanding was that . . . Plaintiff Gaines and [Morris], both wanted to reunify. During this meeting, she saw affection between them . . . [that] she had not seen before.

(Id. No. 9.)

Following the meeting, "[i]n April 2010, Defendant Davis submitted a report to the [Juvenile] Court that Plaintiff Gaines and [Morris] had expressed a desire to reunify and indicated to the court that she was changing her recommendation from terminating Family Reunification to allowing Plaintiffs . . . [to reunite]." (Id. No. 10.) However, in May 2010 Davis "recommended the court grant restricted or supervised visitation again." (Id. No. 11.)

> Defendant Davis testified she recalls . . . that the basis for requesting the court . . . [restrict] visitation again [in May 2010] was because she could not assess the quality of the interaction between Plaintiffs. There was no feedback from Plaintiff[s] Gaines or [Morris on this issue]. [Further, Morris] had been observed to increase opposition toward participating in [county] services following the change in visitation from supervised to unsupervised. Plaintiff Gaines testified that she disagreed with this change of visits. [She] felt she had no control over Defendant [Davis'] interactions with her daughter.

(Id. Nos. 11-12.)

While Morris was in foster care she "did not have any

8

1 complaints about her care . . . . She never felt unsafe." (Id.
2 No. 13; Dep. Olympia Morris 62:15-64:11, Ex. E to Decl. Carol
3 Wieckowski Supp. Davis Mot. Summ J., ECF No. 31.) When Defendant
4 Davis saw Morris "within the [foster] home and . . . at school or
5 in other capacities such as visitation with Plaintiff Gaines,
6 [Morris] never expressed any concerns to . . . Davis about
7 residing with [her foster mother.]" (Davis SUF No. 13.) "[Morris]
8 testified that she was having regular visits with a social worker
9 [from CPS] the whole time she lived [with her foster mother.]"
10 (Id. No. 8.)

> [Morris] asserts that [in September of 2010, after Davis was no longer her social worker] she was sexually assaulted in the home of two acquaintances, 'Robert' and 'Anthony'. [Morris] was at the home of 'Robert and Anthony' without the permission of [her foster mother]. The foster [mother] had notified the police that she suspected that [Morris] was at [Robert and Anthony's house], and the police responded . . . . However, [Morris] hid from the police and [Robert] persuaded them that [Morris] was not there.

(SUF Nos. 106-108; Dep. Olympia Morris 90:6-96:25, Ex. A to O'Dea Decl.; Davis SUF No. 14)

"On March 10, 2011 the Juvenile Court ordered that the dependency of [Morris] be terminated and that sole physical and legal custody be awarded to [Gaines]." (SUF No. 109.)

### III. DISCUSSION

Defendants argue the motions should be granted because "[n]o Defendant . . . removed [Morris] from [Gaines'] house or participated in [her] removal," and Defendants "acted appropriately, professionally, responsibly, and in good faith in investigating [Gaines' alleged abusive treatment of Morris] and

9

presenting . . . information to the [J]uvenile [C]ourt." (Defs.' Mot. Summ J. ("Mot.") 3:21-24, 47:13-15, ECF No. 29.) Further, Defendants argue "there is no evidence that any . . . [Defendant] engaged in the falsification of reports or facts submitted to the [Juvenile] [C]ourt [or] . . . [was] negligent in the selection or supervision of [Morris'] foster care placement." (Mot. 38:21-23, 45:22-25.) These arguments are adequately supported by the uncontroverted facts.

Plaintiff Gaines responds to the motions with the conclusory assertions that CPS investigators "ignored" information that was helpful to Gaines' case in the Juvenile Court dependency proceedings, and that "[d]uring the [dependency hearings] . . . [Defendants] lied under oath and hid evidence from the court." (Gaines' Response 1-2.)

However, Plaintiffs "cannot establish a disputed question of material fact, and thereby avoid summary judgment, by making . . . 'bare assertion[s]' that [are] devoid of 'any legal or factual support.'" Kitchens v. Pierce, 565 F. App'x 590, 591 (9th Cir. 2014) (quoting DeNieva v. Reyes, 966 F.2d 480, 486 (9th Cir. 1992)). Further, "[m]ere argument does not establish a genuine [dispute] of material fact to defeat summary judgment." MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 518 (9th Cir. 1993), cert. dismissed, 510 U.S. 1033 (1994); see generally Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (stating the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'") (quoting Rule 56(e)'s Advisory Committee Note on the 1963 Amendments to the

Rule). "In the absence of specific facts . . . showing the existence of a genuine [dispute] for trial, a properly supported summary judgment motion should be granted." <u>Nilsson, Robbins, Dalgarn, Berliner, Carson & Wurst v. Louisiana Hydrolec</u>, 854 F.2d 1538, 1545 (9th Cir. 1988) (finding the district court properly granted the plaintiff's summary judgment motion where "the defendants against whom summary judgment was entered made no showing of specific facts in their opposition.")

## IV. CONCLUSION

For the foregoing reasons, each Defendant's summary judgment motion is granted, and judgment shall be entered in each Defendant's favor.

Dated:  May 8, 2015

_____
GARLAND E. BURRELL, JR.
Senior United States District Judge